SCHAEFER v. UNITED STATES.

VOGEL v. UNITED STATES.

WERNER v. UNITED STATES.

DARKOW v. UNITED STATES.

LEMKE v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 270–274. Argued October 21, 1919.—Decided March 1, 1920.

The Espionage Act is constitutional. P. 470. *Sugarman* v. *United States*, 249 U. S. 182.

As applied to any of several defendants in a criminal case, the provision of Jud. Code, § 287, that all shall be deemed a single party for the

purpose of peremptory challenges, is constitutional. P. 470. *Stilson* v. *United States,* 250 U. S. 583.

In a prosecution of several under the Espionage Act, *held* that the evidence was sufficient to warrant conviction as to some but not as to the others. Pp. 470, 478.

In a prosecution under the Espionage Act for wilfully making and conveying false reports and statements with intent to promote the success of Germany and obstruct the recruiting and enlistment service of the United States to the injury of the United States in the war with Germany, where there was evidence that persons conducting a German-language newspaper systematically took news despatches from other papers and published them with omissions, additions, and changes, *held,* that the falsity of such publications, within the meaning of the statute, depended on the fact and purpose of the alterations and the resulting tendency of the articles to weaken zeal and patriotism and thus hamper the United States in raising armies and conducting the war; that the determination of such falsity, the evidence being sufficient, was clearly for the jury and not for the court; and that the court rightly allowed the jury to have recourse to their general knowledge of the war and war conditions in making such determination. P. 471.

The constitutional provision as to liberty of speech and press does not require or authorize the court, wherever criminal abuse of those rights is charged, to override a verdict of guilty by substituting its own opinion of the evidence for that of the jury. P. 474.

Evidence sufficient to sustain any one of several counts will sustain a conviction and sentence upon all, if the sentence does not exceed that which might lawfully have been imposed under any one of them. P. 482. *Abrams* v. *United States,* 250 U. S. 616.

254 Fed. Rep. 135, affirmed in part and reversed in part.

THE case is stated in the opinion.

*Mr. William A. Gray* and *Mr. Henry John Nelson* for plaintiffs in error.

*Mr. Assistant Attorney General Stewart,* with whom *The Solicitor General* and *Mr. W. C. Herron* were on the brief, for the United States.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Indictment in nine counts under the Espionage Act. Preliminary to indicating the special offenses we may say that the indictment charges that at the dates mentioned therein the Philadelphia Tageblatt and the Philadelphia Sonntagsblatt were newspapers printed and published in the German language in Philadelphia by the Philadelphia Tageblatt Association, a Pennsylvania corporation of which defendants were officers; Peter Schaefer being president, Vogel treasurer, Werner chief editor, Darkow managing editor, and Lemke business manager.

That on the dates mentioned in the indictment the United States was at war with the Imperial German Government and the defendants "knowingly, wilfully and unlawfully" "caused to be printed, published and circulated in and through" one or other of those newspapers, false reports and statements of certain news items or despatches purporting to be from foreign places, or otherwise violated the Espionage Act through editorials or other published matter.

In count one the charge is that the intent was "to promote the success of the enemies of the United States, to wit, the said Imperial German Government."

In counts two, three and four the charge is the obstruction of the "recruiting and enlistment service of the United States, to the injury of the United States."

In count five the purpose of publication is charged to be the making of false reports and statements with intent to promote the success of the enemies of the United States.

In counts six, seven and eight there are charges of intent to like purpose.

Count nine charges a conspiracy entered into by defendants to be executed through the agency of the two

newspapers for the purpose (a) to make false reports and statements with intent to interfere with the military and naval operations and success of the United States and to promote the success of its enemies; (b) to cause insubordination, disloyalty and mutiny in the military and naval forces of the United States; (c) to obstruct the recruiting and enlistment service of the United States. And there were specifications in support of the charges.

Demurrers were opposed to the indictment which stated in detail the insufficiency of the indictment to constitute offenses. The demurrers were overruled, the court considering that the grounds of attack upon the indictment could be raised at the trial.

The defendants were then arraigned and pleaded not guilty and when called for trial moved for a severance urging as the reason that the courts had ruled that defendants when tried jointly must join in "their challenge to jurors." Counsel in effect said they contested the ruling and considered the statute upon which it was based to be "in derogation of the individual's rights, guaranteed to him by the Constitution."

Other grounds for severance were urged but the court denied the motion and to the ruling each of the defendants excepted. In fortification of the motion for severance, at the selection of the jury, counsel, in succession for each defendant, challenged particular jurors peremptorily, expressing at the same time the acceptance by the other defendants of the challenged jurors. After ten such challenges had been made counsel interposed a peremptory challenge to other jurors in behalf of all of the defendants, stating as reasons that they "collectively" were not "bound by what their co-defendants may have done with respect to any particular juror, and that, therefore, they are still within their rights." The court denied the challenge, ruling that under the provisions of the act of Congress "all the defendants will be deemed a single party,

and ten challenges having been exercised in the aggregate, the right of challenge is exhausted."

Defendants excepted and the trial proceeded resulting in a verdict as follows: Schaefer and Vogel guilty on count nine only; Werner on counts one, two, four and nine; Darkow on one, three, five, six and nine; Lemke on count nine only.

Motions for arrest of judgment and for a new trial were made and overruled and defendants were sentenced to various terms of imprisonment.

The case is here upon writ of error directly to the District Court as involving constitutional questions.

It is conceded that the constitutionality of the Espionage Act has been sustained (*Sugarman* v. *United States*, 249 U. S. 182), but the constitutionality of the Act of March 3, 1911, c. 231, 36 Stat. 1166, § 287, by which several defendants may be treated as one party for the purpose of peremptory challenges, is attacked. Its constitutionality is established by *Stilson* v. *United States*, 250 U. S. 583.

The other assignments of error are: (1) The Government failed to prove the charge of making false statements as the same was made in the indictment and that therefore the court erred in refusing to instruct the jury to acquit upon the counts charging the offense. (2) "In passing upon the question of falsity of the despatches as published by the appellants and in passing upon any other questions which are a matter of public knowledge and general information" the court erred in instructing the jury that they had "the right to call upon the fund of general information which" was in their "keeping." (3) The court erred in refusing to instruct the jury to render a verdict of not guilty upon all of the counts in case of each of the defendants.

Assignments one and three may be considered together. They both depend upon an appreciation of the evidence

although assignment one is more particular as to the offense charged. But neither can be discussed without a review of the evidence and a detailed estimation of its strength, direct and inferential. That, however, is impossible as the evidence occupies over three hundred pages of the record and counsel have not given us an analysis or compendium of it, but have thrust upon us a transcript of the stenographer's notes of the trial which, counsel for the Government aptly says "presents" of the case "a picture of a certain sort, but it is a picture which is constantly out of focus, being either larger than the reality or smaller." However, we have accepted the labor it imposed and have considered the parts of the evidence in their proper proportions and relation and brought them to an intelligible focus, and are of opinion that the court rightfully refused the requested instructions except as to the defendants Schaefer and Vogel. As to them we do not think that there was substantial evidence to sustain the conviction. They were acquitted, we have seen, of all the individual and active offenses, and found guilty only on the ninth count—the charge of conspiracy.

The second assignment of error is somewhat confusedly expressed. It, however, presents an exception to the charge of the court as to what the jurors were entitled to consider as matters of public knowledge and general information. Counsel apparently urge against the charge that it submitted all the accusations of the indictment to the proof of the public knowledge and general information that the jurors possessed. The charge is not open to the contention, and, as discussion is precluded except through a consideration of the instructions in their entirety, we answer the contention by a simple declaration of dissent from it based, however, we may say, on a consideration of the instructions as a whole not in fragments detached and isolated from their explanations and qualifications. Counsel at the trial attempted

to assign to the charge the generality they now assert and it was rejected.

It is difficult to reach or consider the particulars of counsels' contention, the foundation of which seems to be that the indictment charged the falsification of the "despatches," and that, therefore, the Government must prove the falsification of them. What counsel mean by "falsification," is not easy to represent, they conceding there was proof that "the articles which were published differed from the articles in the papers from which they were copied,", but contending no evidence was offered of what was contained in the original despatches of which the publications purported to be copies. And again counsel say "the falsity, as it has been called, which was proven against the defendants was that the articles which were published differed from the articles in the papers from which they were copied." The charge and proof, therefore, were of alterations—giving the "despatches" by a change or characterization a meaning that they did not originally bear—a meaning that weakened the spirit of recruiting and destroyed or lessened that zeal and animation necessary or helpful to raise and operate our armies in the then pending war. And there could be no more powerful or effective instruments of evil than two German newspapers organized and conducted as these papers were organized and conducted.

Such being the situation and the defendants having testified in their own behalf, and having opportunity of explanation of the changes they made of the articles which they copied, the court instructed the jury as follows: "In passing upon this question of falsity and in passing upon this question of intent and in passing upon, of course, the question of whether or not we are at war, you are permitted to use your general knowledge. I will withdraw the reference to 'intent,' but in passing upon the question of the falsity of these publications, in passing upon the ques-

tion whether we are at war, and in passing upon any other questions which are in like manner a matter of public knowledge and of general information, you have the right to call upon the fund of general information which is in your keeping."

The criticism counsel make of the charge is that "without any proof whatsoever, he [the judge] permitted them [the jury] to apply their general knowledge in determining whether the despatches published by the defendants contained false statements." Indeed counsel go further, and insist that the charge "gave to the jury an unlimited right to use any general information at their disposal in reaching their verdict." The charge itself refutes such sweeping characterization. Nor is it justified. The court said, "The real offense with which these defendants are charged is in putting out these false statements. They received them from a source. That source purported to be the report of a despatch, and the evidence in this case would seem to direct your minds in at least some of these instances, perhaps in many of them, to just where the report of the despatch appeared. They took that report as it came to them, and the charge is, in plain words, that they garbled it, sometimes by adding something to it and sometimes by leaving things out and sometimes by a change of the words. But the substantial thing which you are to pass upon is, was the report or statement that they put out false? Was it wilfully and knowingly false? Was it put out thus falsified with the intent to promote the success of the enemies of the United States." In other words the minds of the jurors were directed to the gist of the case which was despatches received and then changed to express falsehood to the detriment of the success of the United States, and the fact and effect of change the jurors might judge of from the testimony as presented and "from the fund of general information which" was in their "keeping." That is, from the fact of the source

from which the despatches were received, from the fact of war and what was necessary for its spirited and effective conduct and how far a false cast to the despatches received was depressing or detrimental to patriotic ardor. See *Stilson* v. *United States, supra.*

This disposes of the case on the exceptions which are argued. Exceptions one and two are specific and we have discussed them. Exception three is general and involves not only the points we have discussed and selected by counsel for discussion, but involves besides every other objection to the instructions and the sufficiency of the evidence, in all the aspects they can be viewed and estimated.

And as being within its comprehension we are confronted with a contention that the indictment and conviction are violative of the freedom of speech and of the press protected by the Constitution of the United States. The contention is a serious one and, in its justification, it is urged that the power of Congress to interfere with the freedom of speech and of the press must be judged by an exercise of reason on the circumstances. Therefore, in justice to the tribunal below, indeed to ourselves, we must give attention to the contention.

It is not very susceptible of measurement. It is difficult to separate in view of the contentions that are made a judgment of the law from a judgment of conviction under the law and keep free from confusing considerations. Free speech is not an absolute right and when it or any right becomes wrong by excess is somewhat elusive of definition. However, some admissions may be made. That freedom of speech and of the press are elements of liberty all will acclaim. Indeed they are so intimate to liberty in every one's convictions—we may say feelings—that there is an instinctive and instant revolt from any limitation of them either by law, or a charge under the law, and judgment must be summoned against the impulse that might con-

demn a limitation without consideration of its propriety. But notwithstanding this instant jealousy of any limitation of speech or of the press there is adduced an instance of oppression by the Government, and, it is said, to hold that publications such as those in this case "can be suppressed as false reports, subjects to new perils the constitutional liberty of the press, already seriously curtailed in practice under powers assumed to have been conferred upon the Postal Authorities."

If there be such practice this case is not concerned with it. The assertion of its existence, therefore, we are not called upon to consider, as there is nothing before us to justify it. Therefore, putting it aside and keeping free from exaggerations, and alarms prompted by an imagination of improbable conditions, we bring this case, as it should be brought, like other criminal cases, to no other scrutiny or submission than to the sedate and guiding principles of criminal justice. And this was the effort of the trial court and was impressed on the jury.

The court drew the attention of the jury to "the features which gave importance" to the case but admonished it that they brought a challenge to a sense of duty and a sense of justice and that while the enforcement of any law made a "strong call" upon court and jury it could not "override the obligation of the other call, which is to make sure that no man is found guilty of a crime unless the evidence points to his guilt with the degree of certainty which the law requires."

Again, and we quote the words of the court, "No people is fit to be self-governed whose juries, chosen from among the great body of the people, cannot give due consideration to cases of this kind, and who cannot give to any defendant a fair and impartial trial, and render a just verdict. I know of no greater service an American citizen can perform for his country than to manifest by his attitude in cases of this kind that we are a people who

are governed by law, and who follow unswervingly that
sense of justice which we should follow. Calling up just
that spirit of justice, and breathing its very atmosphere,
let us go to a consideration of the real merits of this case."

Did the admonition fulfill the duty of the court or
should the court, as it is intimated, have taken the case
from the jury? To do so is sometimes the duty of a court,
but it is to be remembered a jury is a tribunal constituted
by law as the court is, its function has as definite sanction
as that of the court, and it alone is charged with the con-
sideration and decision of the facts of a case. And the
duty is of such value as to have been considered worthy
of constitutional provision and safeguard. See *Capital
Traction Co. v. Hof.* 174 U. S. 1.

If it be said this comment is but the expression of
commonplaces, we reply that commonplaces are some-
times necessary to be brought forward lest earnestness or
interest disregard them and urge too far the supervising
power of the court, which, we repeat, is subordinate to that
of the jury on questions of fact and certainly "a rule of
reason" cannot be asserted for it upon a mere difference in
judgment. All the principles and practices of the law are
the other way. May such rule be urged in an appellate
court against the concurrence of court and jury in the
trial court; or, if there be division in the appellate court,
for which view may a satisfaction of the rule be asserted?
Passing by presumptions that may be challenged, an
answer in this case may be left to the facts. But first as
to the law.

The indictment is based on the Espionage Act and that
was addressed to the condition of war and its restraints are
not excessive nor ambiguous.[1] We need not enumerate

---

[1] "Sec. 3. Whoever, when the United States is at war, shall willfully
make or convey false reports or false statements with intent to interfere
with the operation or success of the military or naval forces of the
United States or to promote the success of its enemies and whoever,

them.   They were directed against conduct—speech or writings—that was designed to obstruct the recruitment or enlistment service or to weaken or debase the spirit of our armies causing them, it might be, to operate to defeat and the immeasurable horror and calamity of it.

But simple as the law is, perilous to the country as disobedience to it was, offenders developed and when it was exerted against them challenged it to decision as a violation of the right of free speech assured by the Constitution of the United States.   A curious spectacle was presented: that great ordinance of government and orderly liberty was invoked to justify the activities of anarchy or of the enemies of the United States, and by a strange perversion of its precepts it was adduced against itself.   In other words and explicitly, though it empowered Congress to declare war and war is waged with armies, their formation (recruiting or enlisting) could be prevented or impeded, and the morale of the armies when formed could be weakened or debased by question or calumny of the motives of authority, and this could not be made a crime—that it was an impregnable attribute of free speech upon which no curb could be put.   Verdicts and judgments of conviction were the reply to the challenge and when they were brought here our response to it was unhesitating and direct.   We did more than reject the contention; we forestalled all shades of repetition of it including that in the case at bar.   *Schenck* v. *United States*, 249 U. S. 47; *Frohwerk* v. *United States*, 249 U. S. 204; *Debs* v. *United States*, 249 U. S. 211; *Abrams* v. *United States*, 250 U. S. 616.   That, however, though in some respects retrospect,

when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished.   . . ." [Act June 15, 1917, c. 30, 40 Stat. 217.]

is a pertinent introduction to the facts of the pending case.

The charges of the indictment were against certain articles or editorials in the newspapers published by defendants in German and intended to be circulated in families and read by persons who understood that language. The articles were adapted to the situation and, we may say, allusion and innuendo could be as effective as direct charge and "coarse or heavy humor" when accompanied by sneering headlines and derision of America's efforts could have evil influence. And such was the character of the article upon which count three of the indictment was based. It had the following headlines:

"Yankee Bluff.

"Professor Jenny Does Not Take the American Preparations for War Seriously.

"Ambassador Paige Assures England That We Will Send Ten Million Men."

The following, with some other comments, was in the body of the article: "The army of ten million and the hundred thousand airships which were to annihilate Germany, have proved to be American boasts, which will not stand washing. It is worthy of note how much the Yankees can yell their throats out without spraining their mouths. This is in accord with their spiritual quality. They enjoy a capacity for lying, which is able to conceal to a remarkable degree a lack of thought behind a superfluity of words." Coarse indeed, this was, and vulgar to us, but it was expected to produce, and, it may be, did produce a different effect upon its readers. To them its derisive contempt may have been truly descriptive of American feebleness and inability to combat Germany's prowess, and thereby chill and check the ardency of patriotism and make it despair of success and in hopelessness relax energy both in preparation and action. If it and the other articles, which we shall presently refer to,

had not that purpose what purpose had they?  Were they the mere expression of peevish discontent, aimless, vapid and innocuous?  We cannot so conclude.  We must take them at their word, as the jury did, and ascribe to them a more active and sinister purpose.  They were the publications of a newspaper, deliberately prepared, systematic, always of the same trend, more specific in some instances, it may be, than in others.  Their effect or the persons affected could not be shown, nor was it necessary.  The tendency of the articles and their efficacy were enough for offense—their "intent" and "attempt," for those are the words of the law, and to have required more would have made the law useless.  It was passed in precaution.  The incidence of its violation might not be immediately seen, evil appearing only in disaster, the result of the disloyalty engendered and the spirit of mutiny.

The article was preceded by one July 4, 1917, headed "For the Fourth of July," in which it was declared that "The Fourth of July celebration, which has long been an empty formality, will this year become a miserable farce." England was represented as the enemy of the United States, carrying a hostility watchful of opportunity from the time of the Revolution through all crises until the United States "had become so strong that nothing could be undertaken against them."  And further, "The ruling classes of England have always despised and hated the United States, and today while they flatter them, they still cherish the same feeling toward them."  The emphasis of a paragraph was given to the statement that "under Wilson's regime the United States" had "sprung to the side of England as its savior in time of need.  They provided it with the means to carry on the war and when that wasn't enough, they sprang into the war themselves. History will sometime pronounce its judgment upon this."

The aid so asserted to have been rendered to England by President Wilson was represented to have been in

opposition to the wishes of the people expressed, "by the unwillingness of their [the United States'] young men to offer themselves as volunteers for the war. But it will not rest there. The call for peace will come from the masses and will demand to be heard. And the sooner the better. No blood has been shed yet, no hate or bitterness has yet arisen against Germany, who has never done this country any harm, but has sent millions of her sons for its upbuilding. The sooner the American people come to their senses and demand peace, the better and more honorable it will be for this country."

The animus of the article and the effect expected of it need no comment to display. It was followed, supplemented, we may say, and reinforced by another article July 7, 1917. It (the latter) had for headlines the words "The Failure of Recruiting," and recruiting failed, was its representation, notwithstanding an "advertising campaign was worked at high pressure" and "all sorts of means were tried to stir up patriotism." Its further declaration was that "Germany was represented as a violator of all human rights and all international law, yet all in vain. Neither the resounding praises nor the obviously false accusations against Germany were of any avail. The recruits did not materialize." The cause was represented to be "that the American, who certainly cannot be called a coward" did "not care to allow himself to be shot to satisfy British lust for the mastery of the world." And "the people instinctively recognize and feel" that "the pro-British policy of the Government,—is an error, which can bring nothing but injury upon this country." It was then added that "the nation therefore" was doing the only thing it could still do, "since its desires were not consulted at first." It refused "to take part."

The purpose is manifest, however the statements of the article may be estimated, whether as criminal means— violations of law, or the exercise of free speech and of the

press. And its statements were deliberate and wilfully false, the purpose being to represent that the war was not demanded by the people but was the result of the machinations of executive power, and thus to arouse resentment to it and what it would demand of ardor and effort. In final comment we may say that the article in effect justified the German aggressions.

We do not deem it necessary to adduce the other charges of the indictment. We may, however, refer to the plausibility of the excuse of the alteration of Senator LaFollette's speech and remark that it disappears when the speech is considered in connection with the articles that preceded and followed it. The alterations were, it is true, of two words only, but words of different import than those the Senator used. The Senator urged that the burden of taxation made necessary by the war be imposed upon those who might profit by the war in order to relieve those who might suffer by it and be brought to "bread lines." The article changed the words to "bread riots," that is changed the expression of acceptance of what might come as a consequence of the war, to turbulent resistance to it and thus giving the article the character of the others with a definite illustration of the opposition to the war by a Senator and his prophecy of a riotous protest by the people. It will be recalled that in other articles the antagonism of the people to the war was declared and in one of them it was said that the war was commenced "under Wilson's regime" and "without their [the people's] consent."

In conclusion we may add that there are in the record what are called "intent" articles which supplement and emphasize the charges of the indictment, and, it is to be remembered, that defendants were witnesses and had the opportunity of explanation, and to preclude any misapprehension of the German originals or defect in their translation. And the jury could judge of the defendants by their presence.

We have not deemed it necessary to consider the articles commented on with reference to the verdicts; the *Abrams Case* has made it unnecessary. On any count of which any defendant was convicted he could have been sentenced to twenty years' imprisonment. The highest sentence on any defendant was five years.

Further comment is unnecessary and our conclusion is that the judgment must be affirmed as to Werner, Darkow and Lemke but reversed as to Schaefer and Vogel, as to them the case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

Mr. Justice Brandeis delivered the following opinion in which Mr. Justice Holmes concurred.

With the opinion and decision of this court reversing the judgment against Schaefer and Vogel on the ground that there was no evidence legally connecting them with the publication I concur fully. But I am of opinion that the judgments against the other three defendants should also be reversed because either the demurrers to the several counts should have been sustained, or a verdict should have been directed for each defendant on all of the counts.

The extent to which Congress may, under the Constitution, interfere with free speech was in *Schenck* v. *United States*, 249 U. S. 47, 52, declared by a unanimous court to be this:—"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."

This is a rule of reason. Correctly applied, it will preserve the right of free speech both from suppression by tyrannous, well-meaning majorities and from abuse by irresponsible, fanatical minorities. Like many other rules for human conduct, it can be applied correctly only by the

exercise of good judgment; and to the exercise of good judgment, calmness is, in times of deep feeling and on subjects which excite passion, as essential as fearlessness and honesty. The question whether in a particular instance the words spoken or written fall within the permissible curtailment of free speech is, under the rule enunciated by this court, one of degree. And because it is a question of degree the field in which the jury may exercise its judgment is, necessarily, a wide one. But its field is not unlimited. The trial provided for is one by judge *and* jury; and the judge may not abdicate his function. If the words were of such a nature and were used under such circumstances that men, judging in calmness, could not reasonably say that they created a clear and present danger that they would bring about the evil which Congress sought and had a right to prevent, then it is the duty of the trial judge to withdraw the case from the consideration of the jury; and if he fails to do so, it is the duty of the appellate court to correct the error. In my opinion, no jury acting in calmness could reasonably say that any of the publications set forth in the indictment was of such a character or was made under such circumstances as to create a clear and present danger either that they would obstruct recruiting or that they would promote the success of the enemies of the United States. That they could have interfered with the military or naval forces of the United States or have caused insubordination, disloyalty, mutiny, or refusal of duty in its military or naval services was not even suggested; and there was no evidence of conspiracy except the coöperation of editors and business manager in issuing the publications complained of.

The nature and possible effect of a writing cannot be properly determined by culling here and there a sentence and presenting it separated from the context. In making such determination, it should be read as a whole; at least if it is short like these news items and editorials. Some-

times it is necessary to consider, in connection with it, other evidence which may enlarge or otherwise control its meaning or which may show that it was circulated under circumstances which gave it a peculiar significance or effect. But no such evidence was introduced by the Government. The writings here in question must speak for themselves. Fifteen publications were set forth in the indictment; and others were introduced in evidence. To reproduce all of them would unduly prolong this opinion. Four are selected which will illustrate the several contentions of the Government. That at least three of these four were deemed by it of special importance is shown by the fact that each of the three was made the subject of a separate count.

*First:* There were convictions on three counts of wilfully obstructing the recruiting and enlistment service. The conviction of the news editor of so obstructing rested wholly upon his having inserted the following reprint from a Berlin paper in the Tageblatt:

"Yankee Bluff.

"Professor Jenny Does Not Take the American Preparations for War Seriously.

"Ambassador Paige Assures England That We Will Send Ten Million Men.

"London, Aug. 5.—Ambassador Paige followed Lloyd George at Guild Hall in Plymouth, with a great speech. He declares there that the differences between England and the United States in former times were only of a superficial nature, and that both peoples are now united inseparably, to fight for freedom and against the Hydra of militarism. He assures his hearers that the United States is ready for all sacrifices in order to end the war victoriously, and that if necessary it will send ten million men to France."

"Berlin, Aug. 5.—In the 'Täglishe Rundschau,' Professor Jenny writes under the title 'Americanism' as

follows:—Americans think in exaggerations and talk in superlatives. Even Ambassador Andrew White in his Memoirs falls into superlatives in comparatively insignificant cases. He speaks of them as the most important events of his life and maintains that certain people have made an indelible impression on him, whom others consider to be ordinary average men.

"The army of ten million men has dwindled to a voluntary army of 120,000; while the new conscripted army of 565,000 will not even be ready to begin drilling for the front in six months. The hundred thousand air ships were reduced to 20,000 and then to 3,000, which the Americans hope to have ready for next summer if they find the right model for them. As for the thousands of ships that were to be sent across the ocean, America, six months after the declaration of war, has not yet decided whether they are to be wood or steel ships; so far not even the keel of one ship has been laid. It amounts to this that now when the Americans can scrape some tonnage together, the troops are not ready, and when they have the troops ready, the tonnage will not be available.

"The army of ten million and the hundred thousand airships which were to annihilate Germany, have proved to be American boasts which will not stand washing. It is worthy to note how much the Yankees can yell their throats out without spraining their mouths. This is in accord with their spiritual quality. They enjoy a capacity for lying, which is able to conceal to a remarkable degree a lack of thought behind a superfluity of words.

"But some fine day, if they do not stop their boasting and bluffing, it might happen to them that they get the lockjaw, for which there is no better relief than a good box on the ear. Moreover it is not to be assumed that the Americans are really in earnest with the war. No one would be surprised if they found a thousand and one excuses for taking no active part in the European War."

It is not apparent on a reading of this article—which is not unlike many reprints from the press of Germany to which our patriotic societies gave circulation in order to arouse the American fighting spirit—how it could rationally be held to tend even remotely or indirectly to obstruct recruiting. But as this court has declared and as Professor Chafee has shown in his "Freedom of Speech in War Time," 32 Harvard Law Review, 932, 963, the test to be applied—as in the case of criminal attempts and incitements—is not the remote or possible effect. There must be the clear and present danger. Certainly men judging in calmness and with this test presented to them could not reasonably have said that this coarse and heavy humor immediately threatened the success of recruiting. Compare *United States* v. *Hall*, 248 Fed. Rep. 150; *United States* v. *Schutte*, 252 Fed. Rep. 212; *Von Bank* v. *United States*, 253 Fed. Rep. 641; *Balbas* v. *United States*, 257 Fed. Rep. 17; *Sandberg* v. *United States*, 257 Fed. Rep. 643; *Kammann* v. *United States*, 259 Fed. Rep. 192; *Wolf* v. *United States*, 259 Fed. Rep. 388, 391–2.

*Second:* There were convictions on three counts of wilfully conveying false reports and statements with intent to promote the success of the enemies of the United States. The Tageblatt, like many of the smaller newspapers, was without a foreign or a national news service of any kind and did not purport to have any. It took such news usually from items appearing in some other paper theretofore published in the German or the English language. It did not in any way indicate the source of its news. The item, if taken from the English press, was of course translated. Sometimes it was copied in full; sometimes in part only; and sometimes it was rewritten; or editorial comment was added. The Government did not attempt to prove that any statement made in any of the news items published in the Tageblatt was false in fact. Its evidence,

under each count, was limited to showing that the item as published therein varied in some particular from the item as it appeared in the paper from which it had been copied; and no attempt was made to prove the original despatch to the latter paper. The Government contended that solely because of variation from the item copied it was a false report, although the item in the Tageblatt did not purport to reproduce an item from another paper, and in no way indicated the source of the news. Each of the three items following illustrates a different method by which the variation was effected:

1. The publication for which the news editor was convicted on the fifth count by reason of an addition to the item copied:

(The translation of the Tageblatt item as set forth in the indictment.)

"Further Economies.

"Amsterdam, September 2.—It has been reported here that permission to export the wheat and flour on the ships held in New York has been refused. Information to this effect is contained in an official proclamation of the latest cut in bread rations and of the need for economy which has reached the civil authorities: This document says: 'We know now with certainty that we cannot count upon the import of breadstuffs from America and that we must strive to make our own provisions suffice. In initiated circles it is said that under no conditions can the new American proposal be accepted, and that the foodstuffs may rot before the ships will be unloaded.'"

(The original Tageblatt item as set forth in the indictment.)

**Weitere Einschränkungen.**
Amsterdam, 2. Sept. Es wird hier gemeldet, daß der Export von Weizen und Mehl auf den in New York zurückgehaltenen Schiffen verweigert wurde. Eine diesbezügliche Mittheilung ist in einer amtlichen Erklärung der jüngsten Brotrationen-Verringerung und der Aufforderung zur Einschränkung enthalten, welche den Gemeindebehörden zuging. In derselben heißt es: „Wir wissen nun bestimmt, daß wir auf die Einfuhr von Brotgetreide aus Amerika nicht rechnen können, und daß wir uns bemühen müssen, mit den eigenen Vorräthen auszukommen." — In eingeweihten Kreisen heißt es, daß man auf den neuen Vorschlag Amerikas unter keinen Umständen eingehen und das Getreide eher verfaulen lassen wird, als die Schiffe auszuladen.

The falsification charged is said to consist in having added to the despatch which was copied from the Staats-zeitung the words: "In initiated circles it is said that under no conditions can the new American proposal be accepted, and that the foodstuffs may rot before the ships will be unloaded." But it is obvious, upon comparing the English translation with the German original, that the defendant did no such thing. What occurred was, this: The sentence referred to was not made a part of the despatch in the Tageblatt. It followed the despatch; it was not within the quotation marks; and was separated from it by a dash,—a usual method of indicating that what follows is comment or an addition made by the editor. In the English translation, as set forth in the indictment, this sentence, through some inadvertence of the Government's translator or draftsman, was included as part of the despatch and brought with the quotation therein. Evidently both the jury and the trial judge failed to examine the German original.

2. One of the publications for which the news editor was convicted on the first count because of an omission from the item copied:

"Ready for the Fray?

"St. Petersburg, September 7th.—The Russian Baltic Fleet will defend Kronstadt and Reval, and through them the Russian capital itself. The commanders of the two fortresses have made this report to the provisional government. A large part of the Baltic fleet was under control of the Maximalists, who hitherto have opposed Kerensky. The commanders of Sveaborg and Helsingfors have also telegraphed their assurance to the government that the Baltic fleet has expressed its willingness to offer desperate resistance, in case the Germans should make a naval attack upon the strongholds between Riga and the capital.

"Investigation of the Fall of Riga.

"The Russians devastated the land through which

they retreated from Riga, in order to impede the German advance. Roads were broken up, bridges destroyed and provisions burned. A special commission has been set up by Premier Kerensky to investigate the fall of Riga. As far as reports have so far been permitted to appear, it is established that only two regiments gave up their positions without fighting, and the others offered the attacking Germans bold resistance. The retreat was carried out in an orderly manner, in spite of pursuit by the German armies. The first of these, advancing along the coast in the region of Dunaburg, is apparently endeavoring to reach Berna, on the Gulf of Riga. The second German army is pressing along the Pskoff road to execute a turning movement, while the third is energetically pushing in a northeasterly direction against Ostroff. The Germans are showing signs of nervousness in advancing through this marshy lake-strewn country, which are increased by the Russian resistance."

The falsification here is said to consist in the omission from the end of the first paragraph of the following sentence which appeared in the paper from which the item was taken: "From this it can be concluded that the fall of Riga has united the opposing political factions in Russia."

3. The publication for which the news editor was convicted on the sixth count because of the change of a word in the item copied:

"War of the Rich.

"Senator La Follette Thinks They Ought Not to Make a Cent of Profit.

"Hot Fight in the Senate Over Increased Taxation of War Profits.

"Washington, August 21.—Taxation of riches in such a measure that the burdens of the cost of the war will be taken from the shoulders of the poor man was recommended today in the Senate by Senator La Follette in a long speech. He declared that the proposed two billion

dollar bill as drawn up in the Senate's Committee on Financial Affairs is impractical because it covers less than seventeen per cent. of the war expenses of the first year and from this would result the necessity of issuing bonds for billions of dollars. Bonds, however, mean the same as an increased cost of living, and one of the consequences would be that next winter bread riots could be expected in the big cities. He recommended the acceptance of amendments by which further taxation of large incomes and big war profits would be effected, which would bring the total amount of the bill to about $3,500,000,000.

"Senator La Follette declared that wealth had never, in any war, offered itself on the altar of patriotism. He attacked the proposed issue of bonds and prophesied that the Liberty Bonds would eventually find their way into the hands of the rich, if they had not already done so. 'But,' he continued, 'this is not all, for war, and principally the sale of bonds, leads inevitably to inflation. This raises prices and through that the cost of living for the great mass of people is raised. Reason and experience teach us that the policy of financing a war for the most part by borrowing the necessary money, is in itself one of the worst financial burdens that war imposes upon men. But wealth is always a powerful factor in the Government. It fattens on war loans and war contracts as well as on speculation, which is not wanting in time of war. Upon these grounds the rich are always in favor of war, and when they have succeeded in bringing on a war, they are often powerful enough with ministers of war and parliaments and congresses to force the maximum of loans and to reduce taxation to a minimum by every possible intrigue and argument.

"'And that is the case with us in this war. Within thirty days after the declaration of war wealth had precipitated us into bond issues of unheard of size. Morgan came to the city, the press urged it, the administration

commanded it, and Congress authorized the issue of five billions of untaxable Government bonds and two billions of interest bearing Treasury notes.'

"Senator La Follette attacked the program of the administration under which a new tax measure will be introduced next winter. 'Of what use is the postponement?' he asked, 'Whose interest is served if taxes on incomes and war profits are kept down and the masses are delivered over to the money lenders as security for an enormous and wickedly disproportionate issue of bonds?' He insisted that the policy of financing the war should at once be decided upon.

"'To-day the way is clear,' he explained, 'hesitation to provide now for heavy taxes would not be a mistake, it would be something worse.'

"Senator La Follette reviewed the financial history of previous American wars. 'We must not repeat such mistakes,' he said, 'it would be blind madness if we did not learn from the mistakes that were made in previous wars. A mistake that we make now may be fatal. It would certainly cost us untold millions of dollars and thousands upon thousands of lives, as by it we would prolong the war unnecessarily.

"'As long as one man can be found who makes war profits, I am in favor of taking away in taxes such part of those profits as the Government requires, and the Government needs the whole of such profits before adding a penny to the taxation of people who are already staggering under heavy burdens by reason of the higher prices occasioned by the war. This may be a new principle in war financing, but it is the least that one can do for the mass of the people, and it is considerably less than simple justice would demand for them.

"'The great mass of the people bear the costs of war, although they may not be directly taxed one dollar. The great mass of the people pay in higher prices and pro-

longed hours of labor. They pay in service, not alone on
the battle field, but wherever men and women work hard
all day long. But more than all this, they pay the cost of
war with their blood, and their lives, and what is the
greatest sacrifice of all, with the blood and lives of their
loved ones.

"'If bread lines are a familiar sight in every city in the
land, as they undoubtedly will be if the present prices of
the most necessary supplies for living hold firm during the
coming winter, if cold and hunger become daily guests
with thousands of families, who, until now, have only
known comfort, a condition which is certain to come about
during the coming winter months, if no help against the
present level of prices can be found, then it is my opinion
that the members of this Congress will do little enough if
they come to realize that they are adding to the privations
and pains of the mass of the people if they hesitate to place
even a fairly moderate portion of the financial burden
upon the rich.'"

Falsification is charged solely because the word "Brot-
riots" (translated as "bread-riots") was used in the
twelfth line of the article instead of the word "Brot-
reihen" (translated as "breadlines").

The act punishes the wilful making and conveying of
"false reports or false statements with intent to interfere
with the operation or success of the military or naval forces
of the United States or to promote the success of its en-
emies." Congress sought thereby to protect the American
people from being wilfully misled to the detriment of
their cause by one actuated by the intention to further
the cause of the enemy. Wilfully untrue statements which
might mislead the people as to the financial condition of
the Government and thereby embarrass it; as to the
adequacy of the preparations for war or the support of
the forces; as to the sufficiency of the food supply; or wil-
fully untrue statements or reports of military operations

which might mislead public opinion as to the competency of the army or navy, or its leaders (See "The Relation Between the Army and the Press in War Time," War College Publication, 1916); or wilfully untrue statements or reports which might mislead officials in the execution of the law, or military authorities in the disposition of the forces. Such is the kind of false statement and the only kind which, under any rational construction, is made criminal by the act. Could the military and naval forces of the United States conceivably have been interfered with or the success of the enemy conceivably have been promoted by any of the three publications set forth above? Surely, neither the addition to the first, nor the omission from the second constituted the making of a false statement or report. The mistranslation of "breadlines" in one passage of the third, if it can be deemed a false report, obviously could not have promoted the success of our enemies. The other publications set out in the indictment were likewise impotent to produce the evil against which the statute aimed.

Darkow, the news editor, and Werner, the editor, were each sentenced to five years in the penitentiary; Lemke, the business manager, to two years. The jury which found men guilty for publishing news items or editorials like those here in question must have supposed it to be within their province to condemn men not merely for disloyal acts but for a disloyal heart; provided only that the disloyal heart was evidenced by some utterance. To prosecute men for such publications reminds of the days when men were hanged for constructive treason. And, indeed, the jury may well have believed from the charge that the Espionage Act had in effect restored the crime of constructive treason.[1] To hold that such harmless addi-

---

[1] The presiding judge in charging the jury said of the act: "  . . . its general purpose is to protect  .  .  .  our military strength and efficiency, to protect ourselves against anything which would promote

tions to or omissions from news items, and such impotent expressions of editorial opinion, as were shown here, can afford the basis even of a prosecution will doubtless discourage criticism of the policies of the Government. To hold that such publications can be suppressed as false reports, subjects to new perils the constitutional liberty of the press, already seriously curtailed in practice under powers assumed to have been conferred upon the postal authorities. Nor will this grave danger end with the pass-

---

the success of our enemies by undermining our morale, lessening our will to win, or, as it is commonly expressed, our will to conquer  .  .  . creating divisions among our people.  .  .  .       –

"These acts which are prohibited are treasonable in the sense in which that word is used, in the common speech of the people. Indeed, they may constitute legal treason as defined in some jurisdictions, but they are not treason against the United States, for the simple reason that there is a provision in our Constitution, (which, of course, the Acts of Congress follow), that treason against the United States,— you will observe that it does not say 'treason generally,' but treason against the United States shall consist only in making war upon them, or in adhering to their enemies, giving them aid and comfort, and there is another provision to the effect that no person can be convicted of the crime of treason unless there are two witnesses to the same overt act, making, as you will see, it perfectly clear that mere words, whether published or not, as long as they are mere words, do not constitute the crime of treason, but they must be words uttered and published under such circumstances as to become deeds or acts in themselves, as 'words' may be. So that words, unless there is something to which they may attach and unless the direct, natural, and reasonably to be expected consequences of them would be to give aid and comfort to the enemy, do not constitute the crime of treason. Every man will observe, however, that even mere words may be fraught with consequences which, although too remote to constitute the crime of treason, may nevertheless be words which are fraught with most awful consequences  .  .  . and, therefore, it is properly within the province of the law to prohibit  .  .  .  and make it a crime even to utter them. In substance, that is what this law does. Congress could not call some mere words treason, because the Constitution prohibits it, but there is no constitutional limitation on the power of Congress to declare those things a crime against the law which Congress has done in this act.  .  .  ."

ing of the war. The constitutional right of free speech has been declared to be the same in peace and in war. In peace, too, men may differ widely as to what loyalty to our country demands; and an intolerant majority, swayed by passion or by fear, may be prone in the future, as it has often been in the past, to stamp as disloyal opinions with which it disagrees. Convictions such as these, besides abridging freedom of speech, threaten freedom of thought and of belief.

MR. JUSTICE CLARKE, dissenting.

On a single indictment, containing nine counts, five men, Peter Schaefer, Paul Vogel, Louis Werner, Martin Darkow and Herman Lemke, were convicted and sentenced to the penitentiary for printing seventeen articles in a German language newspaper, published at Philadelphia, between June 24 and September 17, 1917.

Schaefer was president and Vogel was treasurer of the company which published the paper, but their entire time was given to the service of labor unions, which had loaned money to the company, and they were given these official positions for the purpose of enabling them to keep informed as to its business progress and the disposition of its earnings.

All the members of the court agree that there was no substantial evidence that Schaefer or Vogel were in any respect responsible for the publications complained of, and that as to them the judgment must be reversed.

In this conclusion I cordially concur, but I go further and am clear that a similar reversal should be entered as to Herman Lemke, who was convicted, as Schaefer and Vogel were, on only one of the nine counts of the indictment.

Lemke was given the sounding title of "business manager," but, as a matter of fact, he was a mere bookkeeper,

of a small business, with very limited authority. The newspaper led a precarious financial existence and Lemke's duties were restricted to making out and collecting bills for advertising and circulation, to paying some bills and to turning over the remainder of the money, if any remained, to the treasurer, Vogel. Lemke himself and two or three other witnesses testified that he had nothing whatever to do with deciding what should be published in the newspaper, and that he never wrote for it excepting that when a reporter was ill he occasionally reported a concert. There was no evidence to the contrary.

On such a record it is very clear that a man holding such a position as Lemke held, could not, and did not, have anything to do with determining what should be published in the paper. He had no more to do with the policy of the paper than a porter would have with determining the policy of a railroad company. In my judgment the failure of proof as to Lemke was as complete as it was as to Schaefer and Vogel and I cannot share in permitting him to be imprisoned in the penitentiary for a year for publications which he was powerless either to authorize or prevent.

A different case is made against Werner and Darkow. Werner was a writer of political editorials for the paper, and Darkow was the news editor. Werner was found guilty on four counts and not guilty on five. Darkow was found guilty on five counts and not guilty on four.

Two of the articles written, or caused to be published, by Werner, and one, or perhaps two, of those caused to be published by Darkow, were of a character such that they might have been fairly convicted of violating the act under which they were indicted, but none of these articles was included in count one, and only one of them was included in count nine, and with respect to this one article in count nine Werner was found not guilty when charged with its publication in count three. The charge of the court did

not distinguish between these really offending publications and the many innocent ones the publication of which was charged to be criminal, with the result, that it failed to give such direction to the deliberations of the jury as I think every person accused of crime is entitled to have given.

The denial of separate motions to instruct the jury to render a verdict of not guilty as to Werner and Darkow on the first and ninth counts seems to me to constitute error so fundamental and pervasive as to render the entire trial unfair and unjust, to a degree which requires the granting of a new trial to each of them.

I shall state my reasons for this conclusion as briefly as I may.

The first count charges that the defendants did "knowingly, wilfully and unlawfully make and convey false reports and statements, with intent to promote the success of the enemies of the United States, to wit, the said Imperial German Government."

The indictment and the record in general make it very plain that the District Attorney, in framing the indictment, and during the trial, believed that the statute prohibiting the making and conveying of a false report and statement would be violated by the publication of any article which had been published elsewhere if, in the publication, it was changed, either by addition or omission, and this without any proof that the original publication was true and the second publication false, and seemingly without regard to whether or not the publication had any tendency to promote the success of the enemy. The trial court accepted this construction of the statute and submitted the first count to the jury on this theory of the law.

I cannot doubt that this was gravely erroneous, for the real purpose of the statute is to punish, published, not suppressed, reports and statements, whether original or

copies, made with the intent to promote the success, and which were of a nature reasonably likely to promote the success, of the enemy of the United States—by discouraging our own people or encouraging the enemy.

The first of the thirteen false reports which it is charged in the first count were published, is typical of the others and will sufficiently explain my position.

It purported to be a despatch from London and translated reads as follows:

"The Crisis.

"Is Advancing in Russia with Rapid Strides. The Coalition Government Will Probably Not Last Long.

"Its Position in Foreign Affairs Is Condemned.

"London, June 23.—The Petrograd correspondent of the Chronicle telegraphs today that a great crisis is in progress in Russia. (By that he means apparently that the unstable and weak coalition government will soon be got rid of. It seems to obey unwillingly the instructions of the Workmen's and Soldiers' Council to request the allies to revise their war aims. The workmen will not stand for this much longer. It is highly significant too that not a word has been reported for four days about the great general congress of the Workmen's and Soldiers' delegates; apparently because its behavior does not please the allies.)

"The correspondent of the Chronicle quotes an extract from Maxim Gorky's newspaper 'New Life' which says that people all over the world are to understand that Russia rejects the aggressive war aims of the allies. The correspondent sees a sign in this that the socialists of Russia will not wait much longer."

Obviously there is nothing in this, as published, which could either discourage Americans or encourage the German enemy, and the indictment does not claim that there is. That which the indictment charges makes the publication criminally false is that there was omitted from it "a

proposal by Maxim Gorky that Russia wage a separate war against Germany." Thus the charge is that the crime consisted not in publishing something which tended to encourage German enemies, but in omitting to publish something which it is conceived might have discouraged them. It is not charged that what was printed was harmful but that something which was unfavorable to Germany was not published.

This is characteristic of all but two of the thirteen articles in the first count, and to these, additions were made so inconsequential as in my judgment not to deserve notice.

It seems to me very clear that the statute could not be violated by publishing reports and statements harmless in themselves and which were not shown to be false, merely because they had been published in a different form in another paper,—and this is the extent to which the proof in this case goes as to all of the publications complained of in the first count. Without more discussion, I am so clear that the requested instruction for the defendants Werner and Darkow as to the first count should have been granted, that I think the refusal of it entitles them to a new trial.

The ninth count consists of a charge of conspiracy on the part of the entire five defendants to wilfully make and convey false reports and false statements with intent to interfere with the operation and success of the military and naval forces of the United States; with wilfully causing and attempting to cause insubordination, disloyalty and mutiny in the military and naval forces of the United States, and with wilfully obstructing the recruiting and enlisting service of the United States by the publication of various articles referred to, but not quoted, in the indictment. With a single exception these articles are the same as those incorporated in the first count and this exception purported to be a despatch from the Hague, giving the

reasons for the unrest in Germany, from which it is charged
there was omitted a statement that one of the reasons for
such unrest was the failure of the submarine campaign
carried on by the German Government. Even in this
ninth count it is not charged that the publications as
actually made were harmful but it proceeds, as does the
first count, upon the implication that they might have
been more discouraging than they were to the German
enemy if the omitted statements had been incorporated
into them, and that for this reason they violated the
statute. In other words, it comes to this, that the ninth
count charges as criminal, not a conspiracy to publish the
articles complained of, which were innocent, but a con-
spiracy to suppress certain statements which were pub-
lished in other newspapers in connection with or as a part
of the published articles and which it is argued might have
been harmful to the German cause if they had been pub-
lished. It is impossible for me to think that the statute
could be violated in any such manner.

It was clearly proved that the newspaper was so poor
financially that it was not able to have telegraphic service
of any character and, morning paper that it was, it filled
its news columns with clippings from the evening papers
of the night before and from early editions of the morning
papers when it could procure them before its hour for
going to press. It did not print nearly as many columns as
the newspapers from which it obtained its news, and for
this reason it was necessarily obliged to cut and condense,
both headlines and the body of the articles. In several of
the instances complained of these exigencies of publication
plainly caused the omissions complained of.

Convinced as I am that the requested instructions to
the jury that Werner and Darkow could not be found
guilty on the first and ninth counts should have been
given and that the charge of the court was so utterly un-
adapted to the case as it would have been if they had been

given, as to be valueless or worse as a direction to the jury, I think that the least that can be done, in the interest of the orderly administration of justice, is to grant a new trial and let a new jury, properly instructed, pass upon the case.

I cannot see, as my associates seem to see, that the disposition of this case involves a great peril either to the maintenance of law and order and governmental authority on the one hand, or to the freedom of the press on the other. To me it seems simply a case of flagrant mistrial, likely to result in disgrace and great injustice, probably in life imprisonment for two old men, because this court hesitates to exercise the power, which it undoubtedly possesses, to correct, in this calmer time, errors of law which would not have been committed but for the stress and strain of feeling prevailing in the early months of the late deplorable war.