**UNITED STATES of America,
Appellee,
v.
Morton SOBELL, Appellant.
No. 151, Docket 27558.**

United States Court of Appeals
Second Circuit.

Argued Dec. 7, 1962.

Decided Feb. 6, 1963.

---

Marshall Perlin and Sanford M. Katz, New York City (Donner, Perlin & Piel), New York City (Frank J. Donner, Eleanor Jackson Piel, New York City, of counsel), (Benjamin Dreyfus, San Francisco, Cal., on brief), for appellant.

Robert J. Geniesse, New York City (Vincent L. Broderick, U. S. Atty. for Southern District of New York, Arthur I. Rosett, Asst. U. S. Atty., on brief), for appellee.

Before SWAN, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

On March 29, 1951, a jury in the Southern District of New York found Morton Sobell guilty, along with Julius and Ethel Rosenberg, under a single count indictment charging a conspiracy to violate 50 U.S.C. (1946 ed.) § 32(a), which made it a crime to "communicate, deliver or transmit, to any foreign government * * * information relating to the national defense", or to aid or induce another to do so. Sobell was sentenced to thirty years imprisonment, under the proviso that whoever shall violate § 32(a) "in time of war shall be punished by death or by imprisonment for not more than thirty years," [1] as contrasted with the twenty years imprisonment that constituted the maximum penalty at other times. This Court affirmed the judgment of conviction, United States v. Rosenberg, 195 F.2d 583 (1952); Judge Frank, who wrote the opinion, dissented as to Sobell on the sole ground that the question whether he had become a party to a larger conspiracy "to transmit all kinds of secret information", or only to a smaller one to transmit "just certain kinds which he knew about", should have been separately submitted to the jury, since many acts and declarations relating to the larger conspiracy which were received in evidence without restriction could properly be considered against him only in the former event. 195 F.2d at 600–602. Certiorari was denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687 (1952).

Sobell's instant motion, the appeal from Judge McGohey's denial of which, 204 F.Supp. 225 (S.D.N.Y.1962), is here before us, is his fifth attempt to obtain post-conviction relief under 28 U.S.C. § 2255 or the Rules of Criminal

---

[1.] Section 32(a) of Title 50 was recodified in 1948 as § 794(a) and (b) of Title 18, 62 Stat. 737. In 1954 the distinction with respect to the penalty in time of war was abolished; violation at any time was made punishable "by death or by imprisonment for any term of years or for life." 68 Stat. 1219.

Procedure.[2] He advances two separate grounds, sometimes hereafter characterized as the Grunewald ground and the "in time of war" ground; he claims, subject to a qualification noted in the margin,[3] that these grounds, although appearing on the trial record itself, have not been heretofore raised either on appeal or on motions for post-conviction relief. Although the Government disputes this, we put the controversy to one side, as we do also the issue of law—on which the courts of appeals have divided —whether the provision of § 2255 that "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner" is applicable when the later motion seeks the same "relief" as an earlier one but on a different ground. See the review of the authorities by Judge Wilbur K. Miller dissenting in Belton v. United States, 104 U.S.App. D.C. 81, 259 F.2d 811, 824–825 (1958); Smith v. United States, 106 U.S.App. D.C. 169, 270 F.2d 921 (1959); Sanders v. United States, 297 F.2d 735 (9 Cir.), cert. granted, 370 U.S. 936, 82 S.Ct. 1592, 8 L.Ed.2d 806 (1962). We read Judge McGohey's opinion as having "entertained" Sobell's motion on the merits; we shall consider the appeal on that basis. See Taylor v. United States, 238 F.2d 409, 411 (9 Cir., 1956), cert. denied 353 U.S. 938, 77 S.Ct. 817, 1 L.Ed.2d 761 (1957).

I. THE GRUNEWALD GROUND.

What we have called the Grunewald ground relates to the point decided in Part III of Grunewald v. United States, 353 U.S. 391, 415–424, 425–426, 77 S.Ct. 963, 980, 1 L.Ed.2d 931 (1957), with respect to the defendant Halperin. When testifying at the trial on his own behalf, Halperin was cross-examined as to various matters on which he had been interrogated before a grand jury; he answered in a way consistent with innocence. The Government was allowed, over objection, to bring out that before the grand jury Halperin had pleaded the privilege against self-incrimination as to these very questions. The judge instructed that although the jury was "not to draw any inference whatsoever as to the guilt or innocence of the defendant in this case by reason of the fact that he chose to assert his unquestioned right to invoke the Fifth Amendment on that previous occasion", it might consider "his prior assertions of the Fifth Amendment only for the purpose of ascertaining the weight you choose to give his present testimony with respect to the same matters upon which he previously asserted his constitutional privilege." We affirmed, 233 F.2d 556, 568 (2 Cir., 1956), relying on Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), and our own previous decision in United States v. Gottfried, 165 F.2d 360, 367, cert. denied 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948), which in turn had cited United States v. Mortimer, 118 F.2d 266 (2 Cir.), cert. denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496 (1941); United States v. Groves, 122 F.2d 87 (2 Cir.), cert.

---

2. See United States v. Rosenberg, 108 F. Supp. 798 (S.D.N.Y.), aff'd 200 F.2d 666 (2 Cir. 1952), cert. denied 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384 (1953); United States v. Sobell, unreported in the District Court and here, No. 22885, cert. denied 347 U.S. 904, 74 S.Ct. 428, 98 L. Ed. 1063 (1954); United States v. Sobell (two motions), 142 F.Supp. 515 (S.D.N.Y.1956), aff'd 244 F.2d 520 (2 Cir.), cert. denied 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957). See also note 3, infra.

3. The Grunewald ground was the basis for a motion in the Supreme Court, in 1957, to vacate the Court's 1952 denial of certiorari and for leave to file a new petition for certiorari raising the point decided by the Court in Grunewald v. United States, 353 U.S. 391, 415–424, 425–426, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); this was denied, 355 U.S. 860, 78 S.Ct. 91, 2 L.Ed.2d 67 (1957). Appellant contends, and we agree, that no weight should be given to this, both because of general expressions as to the lack of significance in the denial of certiorari, e. g., House v. Mayo, 324 U.S. 42, 48, 65 S.Ct. 517, 89 L.Ed. 739 (1945), and cases cited, and because of the peculiar likelihood that the denial in this instance may have been for untimeliness.

denied 314 U.S. 670, 62 S.Ct. 135, 86 L. Ed. 536 (1941), and United States v. Klinger, 136 F.2d 677 (2 Cir.), cert. denied 320 U.S. 746, 64 S.Ct. 48, 88 L.Ed. 443 (1943). Judge Frank dissented, 233 F.2d 571–592. The Supreme Court unanimously reversed. The opinion of the Court, by Mr. Justice Harlan, held that "in the particular circumstances of this case the cross-examination should have been excluded because its probative value on the issue of Halperin's credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury", to wit, as direct evidence of guilt. 353 U.S. at 420, 77 S.Ct. at 982. Recognizing that "the question whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of credibility is usually within the discretion of the trial judge", the Court held that "where such evidentiary matter has grave constitutional overtones, as it does here", the Court would "draw upon our supervisory power over the administration of federal criminal justice in order to rule on the matter. Cf. McNabb v. United States, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819]." 353 U.S. at 423–424, 77 S.Ct. at 983–984. Mr. Justice Black, for the Chief Justice, Mr. Justice Douglas, Mr. Justice Brennan and himself, did "not, like the Court", rest his "conclusion on the special circumstances of this case"; he could "think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it." 353 U.S. at 425, 77 S.Ct. at 984.

The asserted bearing of Grunewald here is as follows: The Government's case against Sobell rested almost wholly on the testimony of Max Elitcher, who, in addition to testifying to some independent attempts at espionage by Sobell, linked him closely with Julius Rosenberg. The latter contradicted the testimony of Elitcher with respect to Sobell, as he also did the testimony of David and Ruth Greenglass and Harry Gold with respect to the disclosure of atomic secrets by him and his wife. Ethel Rosenberg corroborated many of her husband's de-

nials of the testimony of the Greenglasses and Gold. Her evidence did not bear directly on Sobell, but there was no particular reason why it should, since Elitcher had not implicated her in any of Sobell's activities. Sobell did not take the stand.

Mrs. Rosenberg testified on direct and cross-examination about many matters upon which she had claimed the privilege before the grand jury. Repeatedly the prosecutor questioned her as to the supposed inconsistency between the versions of innocence to which she testified at the trial and her previous claim that answering questions about these same matters would tend to incriminate her. When objections or motions for a mistrial were made, the judge overruled or denied them, as he was required to do by the decisions of this Court cited in our opinion in Grunewald. Both during the trial and in his charge the judge made it crystal-clear that Mrs. Rosenberg's "failure to answer such questions [before the grand jury] is not to be taken as establishing the answers to any questions she was asked before the Grand Jury, but may be considered by you in determining the credibility of her answers to those same questions at this trial"—a correct statement of the rule as then established in this circuit. The matters about which Mrs. Rosenberg was interrogated with respect to her prior claim of privilege included her admission at the trial that she had consulted a lawyer prior to appearing before the grand jury; her denial of having discussed the case with her brother, David Greenglass; her denial of having discussed David's atomic work with him or his wife, or with her husband; her memory of a furlough visit from David in January 1945; her denial of having seen Harry Gold until he appeared in the courtroom; and her denial of having ever met Anatoli Yakovlev.

As regards some of these items, there was greater inconsistency between Mrs. Rosenberg's claim of privilege before the grand jury and her testimony at the trial than in Halperin's case. It is hard, for example, to see how her claim before

the grand jury that answering the questions about Harry Gold and Yakovlev would tend to incriminate her can be reconciled with the answers—outright denials of knowing either man—that she gave to these questions at the trial; it can scarcely be said, as the Supreme Court said of Halperin, that "[h]ad [she] answered the questions put to [her] before the grand jury in the same way [she] subsequently answered them at trial, this nevertheless would have provided the Government with incriminating evidence from [her] own mouth." 353 U.S. at 421–422, 77 S.Ct. at 982–983. Hence, as regards these questions, it is by no means certain that the test laid down by the majority of the Supreme Court in Grunewald, that of balancing probative value against danger of prejudice, would have led in this case to the same result. We need not decide whether, as Sobell contends, that result would nevertheless be required by other factors present in this case but absent in Grunewald, such as the prosecutor's interrogation as to whether the claims of privilege before the grand jury had been truthful, and as to the reasons why the privilege had been claimed. For the inquiry about the prior claim of privilege in regard to questions answered at the trial otherwise than by outright denials—for example, those concerning Mrs. Rosenberg's relations with the Greenglasses and her consultation with her lawyer—would fall under the analysis made by the majority in Grunewald.

■ Sobell contends that if the point had been made on Mrs. Rosenberg's appeal to this Court (where presumably it would not have prevailed at the time, despite Judge Frank's subsequent espousal of it in his Grunewald dissent), if the Supreme Court had granted certiorari, and if the Court had then decided as it did five years later in Grunewald, any new trial would have included Sobell, since the Government's evidence was broadly inconsistent with a conclusion that he alone was guilty. It could be said against this that, vis-à-vis her co-defendants, Mrs. Rosenberg was simply a witness, and that the improper denial of a claim of privilege by a witness normally is not a ground for granting a new trial on the appeal of a party, "whose only grievance can be that the overriding of the outsider's rights has resulted in a fuller fact-disclosure than the party desires." McCormick, Evidence (1954), p. 153 and see cases cited in fn. 8; 8 Wigmore, Evidence (McNaughton rev. 1961) pp. 112–113, 416. But the claim in this case is not merely the compulsion of testimony that was privileged but otherwise unobjectionable; the claim is that the jury was allowed—properly, as the law then stood in this circuit—to consider evidence which, under the rule later laid down in Grunewald, had a probative value "so negligible as to be far outweighed by its possible impermissible impact on the jury". 353 U.S. at 420, 77 S.Ct. at 982. In any event, this Court has held, on a direct appeal, that improper use of a witness' claim of Fifth Amendment privilege before the grand jury to impeach him at the trial can constitute a ground for reversing the conviction of the party for whom he testified, and, further, has followed the principle that "[w]here errors as to one defendant are so substantial and of such nature as to affect a co-defendant with whom he is tried jointly, appellate courts have reversed the convictions of both defendants * * *." United States v. Tomaiolo, 249 F.2d 683, 690–692, 696 (2 Cir., 1957), and cases cited. Assuming all this in Sobell's favor, we thus arrive at the crucial issue of whether he is entitled to relief under 28 U.S.C. § 2255.

■ That statute permits a federal prisoner to move at any time to vacate or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." The second ground is not claimed to be applicable, nor is the third as to the

Grunewald point. Since we now know that a different ruling was required on the issue later decided in Grunewald, it is argued that Sobell comes under the first ground in that his sentence was "imposed in violation of the laws of the United States." But if we were to read the statute to mean that relief is to be granted in every such case, we would be saying that § 2255 extends to any material error in a federal criminal trial, even one discernible only through hindsight—a result manifestly not intended by the framers, as shown by the review of the legislative history in United States v. Hayman, 342 U.S. 205, 210–219, 72 S. Ct. 263, 96 L.Ed. 232 (1952), and a reading that has been repudiated by the Supreme Court, Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), as it had earlier been by this Court, United States v. Angelet, 255 F.2d 383 (2 Cir., 1958).[4] Moreover, different words are used in the third paragraph of § 2255, dealing with the action to be taken on the motion: "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." Here the broad reference of the initial paragraph to "violation of the * * * laws of the United States" seems to have disappeared, at least if we can assume that the phrase "that the sentence imposed was not authorized by law" in the third paragraph means the same as "that the sentence was in excess of the maximum authorized by law" in the first;[5] and even "a denial or infringement of the constitutional rights of the prisoner" does not call for relief unless it be "such

4. The language under discussion stems from the Habeas Corpus Act of 1867, 14 Stat. 385, providing that "the several courts of the United States * * * within their respective jurisdictions, in addition to the authority already conferred by law, shall have power to grant writs of *habeas corpus* in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States * * *," as carried forward in Rev.Stat. § 752 ("is in custody in violation of the Constitution or of a law or treaty of the United States"). This is now codified in 28 U.S.C. § 2241(b)(3), with "law" changed to "laws," as it is in § 2255. It is not entirely clear whether "law" in the Act of 1867 referred to the entire corpus of federal legal rules outside the Constitution and treaties, or only to federal statutes. Particularly in view of the adoption of the Act during the reconstruction period and the then received view that "In the ordinary use of language, it will hardly be contended, that the decisions of courts constitute laws," Swift v. Tyson, 16 Pet. 1, 18, 10 L.Ed. 865 (1842), the latter reading would seem more reasonable. For reasons later outlined in the text, we are not here required to decide whether the 1948 enactments preserved this original meaning or embodied the "[new] way of looking at law," Guaranty Trust Co. of New York v. York, 326 U.S. 99, 101, 65 S.Ct. 1464, 1466, 89 L.Ed. 2079 (1945), taught by Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under either construction there remains the basic question, which exists also as to the reference to the Constitution, whether a prisoner who has had a fair opportunity to try out his claim before a proper tribunal is "in custody in violation of" federal law simply because the earlier tribunal committed what a later one would consider an error in decision. See Hart & Wechsler, The Federal Courts and the Federal System (1953), 1238–39; Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441, 447–448, 474–477 (1963).

5. Recognition of the availability of *habeas corpus* to test alleged illegality in the sentence as distinguished from the conviction long antedates the modern use of the writ with respect to the latter. Ex parte Lange, 18 Wall. (85 U.S.) 163, 21 L.Ed. 872 (1874); Ex parte Wilson, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885); In re Snow, 120 U.S. 274, 7 S. Ct. 556, 30 L.Ed. 658 (1887); Ex parte Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889).

\* \* \* as to render the judgment vulnerable to collateral attack." Juxtaposition of the two paragraphs thus suggests a reading that although any substantial claim of violation of federal "law", see fn. 4, supra, will get a federal prisoner into court under § 2255 in the sense of giving the court the power and duty to consider his motion, he can stay there and obtain relief only if he shows that the sentencing court was without jurisdiction, that the sentence was beyond the authorized maximum, or that the sentence or judgment is subject to collateral attack, leaving the meaning of this last phrase to be worked out by the courts—with an indication that although constitutional rights stand on a particularly high plane, not every "denial or infringement" even of them makes the judgment "vulnerable to collateral attack." But see, taking the view that relief is available under § 2255 for any denial of a constitutional right, the dissent of three Justices in Hodges v. United States, 368 U.S. 139, 140, 82 S.Ct. 235, 7 L.Ed.2d 184 (1961). Under a more literal reading the judgment of conviction, as distinguished from the sentence, can be successfully challenged *only* for denial or infringement of rights protected by the Constitution itself; only then

is "the judgment vulnerable to collateral attack."

■ If it be deemed futile to endeavor to draw much meaning from the rather murky language of § 2255 and we turn for help to the decisions thereunder, we find these telling us that, in determining whether relief under § 2255 ought be granted, we should look to the previous practice in habeas corpus with respect to federal prisoners; indeed, the Supreme Court has said that "the legislation was intended simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined." Hill v. United States, supra, 368 U.S. at 427, 82 S.Ct. at 471. But this also does not get us far; the glass itself is a dark one. See Bator, supra, fn. 4, at 465–74, 493–95. Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), sheds as much light as anything. Applying the standards limned in that and other opinions of the Supreme Court as best we can, we shall assume *arguendo*—in all likelihood too favorably for appellant, and without qualifications which may well be needed in other factual settings [6]—that he

---

6. Among such qualifications are questions how far constitutional rights may be waived and what circumstances constitute such a waiver, see Adams v. United States ex rel. McCann, 317 U.S. 269, 275–281, 63 S.Ct. 236, 87 L.Ed. 268 (1942); whether even constitutional claims must not be brought in some way to the attention of the trial court or else will be deemed "waived", see Howell v. United States, 172 F.2d 213, 215 (4 Cir.), cert. denied 337 U.S. 906, 69 S.Ct. 1048, 93 L.Ed. 1718 (1949); United States v. Walker, 197 F.2d 287, 288 (2 Cir.), cert. denied 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952); whether alleged errors in the determination of facts affecting conceded constitutional rights stand on the same footing as an alleged refusal to recognize the rights or failure to make them effective when the facts were undisputed from the outset or are no longer in controversy; and whether the alleged deprivation must be shown to have had a material effect, see Kyle v. United

States, 297 F.2d 507, 511–515 (2 Cir., 1961). Special considerations may arise in cases where the Supreme Court has overruled one of its own decisions which had held that a particular practice did not violate constitutional rights, an issue that will be sharply raised in cases under § 2254 brought by state prisoners as a result of the overruling of Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L. Ed. 1782 (1949), in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). See, e. g., People v. Loria, 10 N.Y.2d 368, 223 N.Y.S.2d 462, 179 N.E.2d 478 (1961). In such cases, even assuming the necessity of raising constitutional claims on appeal in the ordinary case, it must be conceded that appeal would have seemed futile; compare the suggestion in Sunal v. Large, supra, 332 U.S. at 181, 67 S.Ct. at 1592, that one of the exceptional circumstances justifying the use of *habeas corpus* to raise a point that could have been but was not appealed is "where the law was changed after the

should have relief under § 2255 if he has shown (1) a significant denial of a constitutional right, even though he could have raised the point on appeal and there was no sufficient reason for not doing so, 332 U.S. at 178–179 and fn. 8, 182, 67 S.Ct. 1590–1591 and 1592; see also United States v. Rosenberg, 200 F.2d 666, 671 (2 Cir., 1952), cert. denied 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1334 (1953); United States v. Allocco, 305 F.2d 704, 707 fn. 8 (2 Cir., 1962); or (2) a defect seriously affecting his trial, even though not of constitutional magnitude, if it was not correctible on appeal or there were "exceptional circumstances" excusing the failure to appeal, 332 U.S. at 180–181, 184, 67 S.Ct. at 1592, 1593; see also Bowen v. Johnston, 306 U.S. 19, 26–28, 59 S.Ct. 442, 83 L.Ed. 455 (1939); Jordan v. United States District Court of District of Columbia, 352 U.S. 904, 77 S.Ct. 151, 1 L.Ed.2d 114 (1956), reversing per curiam 98 U.S.App.D.C. 160, 233 F.2d 362, 367–369 (1956); Hill v. United States, supra, 368 U.S. at 428, 82 S.Ct. at 471.

■ Sobell does not bring himself within the first category on the Grunewald ground since this is not of constitutional dimensions as to him. On the view of the majority in Grunewald, the reversal was not for denial of a right guaranteed by the Fifth Amendment but because the trial judge had abused his discretion in determining that the probative effect of the evidence outweighed its potentially prejudicial impact. True, the potential prejudice lay in the probability of the jury's drawing an impermissible inference of guilt from the claim of privilege and the issue was thus thought to have "grave constitutional overtones". 353 U.S. at 423, 77 S.Ct. at 983. But the majority's invocation of the Court's "supervisory power over the administration of federal criminal justice in order to rule on the matter", and its citation of

McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), show that the Court did not think it was enforcing a constitutional claim. The opinion of the four concurring Justices can be read as saying only that there is no basis for drawing any inference from a claim of the privilege against self-incrimination, and hence that a reference to such a claim can never be relevant to impeach credibility, and thus also as enforcing only a rule of evidence. See Stewart v. United States, 366 U.S. 1, 7, fn. 14, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). On the other hand, a general proscription of drawing inferences from a claim of the privilege against self-incrimination sounds like constitutional doctrine, and has the same effect as an avowedly constitutional precept that any later reference to a claim under the Fifth Amendment is impermissible because it renders the claim of privilege too hazardous, a view suggested by other language in the concurring opinion and by the citation of Johnson v. United States, 318 U.S. 189, 196–199, 63 S.Ct. 549, 87 L.Ed. 704 (1943). But even if the Supreme Court would now deem Grunewald to be constitutionally grounded, a sufficient answer here would be that any constitutional implications must be limited to the person whose claim of privilege was later used against him. "[T]he privilege is that of the witness himself, and not that of the party on trial." McAlister v. Henkel, 201 U.S. 90, 91, 26 S.Ct. 385, 50 L.Ed. 671 (1906); see Sachs v. Government of the Canal Zone, 176 F.2d 292–296 (5 Cir.), cert. denied 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949); 8 Wigmore, Evidence (McNaughton rev. 1961), pp. 414–415; McCormick, Evidence (1954), p. 152. Although perhaps Sobell also may have been entitled to object on the ground of irrelevancy, namely, that at least in some instances there may have been no real inconsistency between Mrs. Rosenberg's claim of privilege before the

time for appeal had expired." As against this, there is the undesirability of having to reconsider hundreds of cases, decided correctly under the law as precisely ruled

at the time, in only a few of which will the contentions be made out on the facts. See Bator, supra, note 4, 527 fn. 220.

grand jury and her testimony of innocence at the trial, the overruling of such an objection, even if this should now appear erroneous in the light of Grunewald, would not assume "constitutional proportions", Sunal v. Large, supra, 332 U.S. at 182, 67 S.Ct. at 1593. Sobell, therefore, can succeed only by bringing himself within the second category outlined above.

■ Admittedly there was no procedural obstacle to the raising on appeal of the question here presented. Neither do we find any greater showing of exceptional circumstances justifying the failure to raise the question than in Sunal v. Large, supra. The defendants in the two cases there decided had faced a consistent line of lower court decisions adverse to their position, including a case, Rinko v. United States, in which certiorari had been denied, 325 U.S. 851, 65 S.Ct. 1086, 89 L.Ed. 1971 (1945), before the conviction of one of them; here there had been a line of adverse decisions by this Court, with certiorari denied. There many of the lower court decisions had rested on a Supreme Court opinion, Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944), not reading precisely on point but erroneously thought to be decisive by the lower courts, as it later was by three Justices of the Supreme Court, Estep v. United States, 327 U.S. 114, 137–139, 145, 66 S. Ct. 423, 90 L.Ed. 567 (1946); here a similar role was played by Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). In fact, Raffel was distinguishable on the ground, whether satisfying or not, that it involved an inference from a defendant's failure to take the stand to challenge certain testimony at a previous trial, rather than from a claim of privilege before a grand jury, and that it "did not focus on the question whether the cross-examination there involved was in fact probative in impeaching the defendant's credibility," 353 U.S. at 420, 77 S.Ct. at 982; and Johnson v. United States, supra, afforded

indication that Raffel would be rather closely confined. The road to ask the Supreme Court to test the distinction was open; when it was taken in Grunewald, the Court decided for the petitioner, without overruling Raffel as the four concurring Justices were willing to do. As in Sunal v. Large, "The case, therefore, is not one where the law was changed after the time for appeal had expired. Cf. Warring v. Colpoys, 74 App.D.C. 303, 122 F.2d 642 [136 A.L.R. 1025]. It is rather a situation where at the time of the convictions the definitive ruling on the question of law had not crystallized." 332 U.S. at 181, 67 S.Ct. at 1592.

■■ We think it important to emphasize, as did the Supreme Court in Sunal v. Large, the policy considerations underlying what may seem to some a hoary and technical rule—"that the writ of *habeas corpus* will not be allowed to do service for an appeal," 332 U.S. at 178, 67 S.Ct. at 1590. The problem, as Mr. Justice Douglas there said, "has radiations far beyond the present cases." 332 U.S. at 181, 67 S.Ct. at 1592. There is an inevitable attraction in the position that a person convicted of a serious crime should receive a new trial whenever a later decision of the highest court indicates that, with the benefit of hindsight, a different course should have been followed at his trial in any consequential respect. Yet for courts to yield broadly to that attraction not only would cause "litigation in these criminal cases [to] be interminable" 332 U.S. at 182, 67 S.Ct. at 1593, but, in the sole interest of those already convicted of crime, would drastically impair the ability of the Government to discharge the duty of protection which it owes to all its citizens. If the point on which Sobell now relies had been raised and sustained on appeal, that would on no account have led to a direction for acquittal. Even under all the elaborate safeguards with which this country properly surrounds those charged with crime, it would have led only to a new trial, in which it seems unlikely that

the result as to any of the defendants would have differed. When a claim is raised upon direct appeal as this could have been, and is there sustained, a new trial can be had seasonably, when witnesses are still available and their recollections still fresh. In contrast, collateral attack can come at any time. Yet normally it is quite academic to talk of a new trial ten or fifteen years after the event; in most cases to direct one after such an interval is in practical result to order a release from further punishment, although the defendant does not even contend he is entitled to that relief from the courts. When a defendant who has been tried fairly in accordance with the law as it was understood at the time seeks judicial relief because of new light on a point of law affecting an aspect of his trial, his request must be balanced against the rightful claims of organized society as reflected in the penal laws. All this is the wisdom behind the doctrine that limits collateral attack on criminal judgment. See Fuld, J., in People v. Howard, 12 N.Y.2d 65, 236 N.Y.S.2d 39, 187 N.E.2d 113 (1962).

II. THE "IN TIME OF WAR" GROUND.

The indictment charged that "On or about June 6, 1944, up to and including June 16, 1950, * * * the defendants herein, did, the United States of America then and there being at war, conspire" to communicate national defense information to the Soviet Union in violation of 50 U.S.C. § 32(a). The overt acts cited, none of which in terms referred to Sobell, were laid between June 6, 1944 and January 14, 1945. Elitcher's testimony would have placed Sobell's entrance into the conspiracy no later than June, 1944. But whereas the evidence as to the disclosure of atomic secrets by the Rosenbergs, in which Sobell was not proved to have participated, related principally to the period prior to the surrender of Japan on September 2, 1945, the greater portion of the evidence against Sobell concerned 1946, 1947 and 1948.

At the trial the defendants did not dispute that if the Government's evidence was believed, they were subject to the punishment of death or thirty years imprisonment which the proviso to § 32(a) made applicable to a violation "in time of war." It was hardly conceivable that any such claim would be made by the Rosenbergs, so far as this statute was concerned, since the portion of the conspiracy relating to disclosure of atomic secrets, which dwarfed the other charges against them, was largely consummated before the fighting stopped. For Sobell the situation was different; it was possible in theory, however unlikely in fact, that the jury could divide Elitcher's testimony against him and credit only the part relating to later years. But in his case also there was no dispute that if he had committed any offense he had done so "in time of war"; his counsel, in summation, emphasized that Sobell's life was at stake and that "the statute says for this crime that Mr. Elitcher is trying to prove Mr. Sobell guilty of, he can get up to thirty years or death." Under these circumstances it was altogether natural that the judge, who had received no request on the subject, did not include in his charge any reference to the term "in time of war" and told the jury, without objection from anyone, that the case was one in which the penalties of the proviso were applicable. He did, however, submit the indictment to the jury, and they found the defendants "guilty as charged."

Sobell would now find in this a defect entitling him to have his conviction vacated under § 2255 or, in the alternative, to have his sentence reduced under F.R.Crim.Proc. 35. The basis of the argument is that whether § 32(a) was violated "in time of war" was a matter for determination by the jury as a part of its verdict. We accept this as a premise to the extent of holding that a defendant being tried under § 32(a) was entitled, on proper request, to have the jury determine whether any violation of the statute on his part occurred "in time of war" as that term would be defined for the jury by the judge. The next steps in the argument are that the "time of

war" ended with the cessation of fighting on August 14, 1945, or with the unconditional surrender of Japan on September 2, 1945, or in any event when the President proclaimed the termination of hostilities on December 31, 1946, 61 Stat. 1048-and that the jury should have been so instructed. Since it was not, and since it might have convicted Sobell on the basis of believing only the portion of Elitcher's testimony relating to acts subsequent to those dates, the thirty-year sentence is said to be one "not authorized by law or otherwise open to collateral attack" under § 2255 or, in the alternative, "an illegal sentence" under F.R.Crim.Proc. 35. "Exceptional circumstances" are alleged to excuse the failure to raise the point at trial or on appeal, since, it is said, until the decision in Lee v. Madigan, 358 U.S. 228, 79 S.Ct. 276, 3 L.Ed.2d 260 (1959), it was universally assumed that "time of war" continued until a treaty of peace had been ratified or a peace proclamation issued. At least this seems the most effective statement of the argument. For it would require stronger language than anything in Stilson v. United States, 250 U.S. 583, 587–588, 40 S.Ct. 28, 63 L.Ed. 1154 (1919), or Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360 (1920), relied on by appellant, to convince us that the jury ought to have been allowed to make its own determination of when the war ended, a question of law which, as we shall see, is not readily answered even by judges.

■ Before proceeding further we must consider a threshold point, even though it has not been raised by the Government, as to the applicability of § 2255 to the "in time of war" ground. In Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), a majority of the Justices joined in a concurring opinion, by Mr. Justice Stewart, taking the position that § 2255 is available only to a prisoner claiming the "right to be released." Here it could be said that if we should sustain Sobell's contention, the Government, rather than undergo a new trial, might consent to a

reduction of the sentence to the twenty years that would have been permissible even if Sobell's violation of § 32(a) had been in time of peace, and, if it did, Sobell would have no "right to be released" and § 2255 would not be available. We do not read the statute, even in the light of the concurring opinion in Heflin, as calling for that result. Mr. Justice Stewart and his colleagues were addressing themselves to a situation where a prisoner in custody under a concededly valid sentence sought to attack a consecutive sentence which had not begun to run. Here Sobell is claiming the "right to be released" from a single sentence which he alleges to be illegal; if his claim were made out and the Government continued to insist on the higher penalty, there would have to be a new trial. The jurisdictional test of the first sentence of the first paragraph of § 2255 is thus satisfied, and the final clause of the third paragraph makes clear that the court is not limited to discharging the prisoner but may "resentence him or grant a new trial or correct the sentence." We therefore pass to the merits.

■ In denying the alternative motion for reduction of sentence under Rule 35, Judge McGohey relied in part upon a theory which, if sound, would cover the motion under § 2255 as well. His reasoning was that even if we should assume the earliest possible date for the end of the war, the jury must have found that the over-all conspiracy had begun before then, and Sobell took the conspiracy as he found it, United States v. Sansone, 231 F.2d 887, 893 (2 Cir.), cert. denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956), and would thus be subject to the higher penalty even if he did not join until after the "time of war" had ended. On appeal the Government has not sought to support the decision on this ground. A person joining a conspiracy does, indeed, take it as he finds it in many respects, including the important one, to which the Sansone opinion had reference, that acts or declarations of conspirators prior to his entry are admissible against him. But here

the question is what Congress meant when it said, 50 U.S.C. (1946 ed.) § 34, that "If two or more persons conspire to violate the provisions of sections 32 or 33 of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy." This language can indeed be read to say that when "the act the accomplishment of which is the object of such conspiracy" was a disclosure of defense information beginning in time of war and continuing into time of peace, the heavier penalty may be visited even on a "party to such conspiracy" who did not join it in wartime. Yet it is difficult to discern what purpose Congress would have thought such a rule would accomplish, and it seems more reasonable to read the section as making the penalty for a substantive offense "in time of war" applicable to conspiring at such a time. Moreover, established principles favor the more lenient construction where ambiguity exists. See, e. g., Bell v. United States, 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

We likewise cannot accept the Government's attempt to dispose of the contention on the basis that "time of war" under § 32(a) continued until the Presidential proclamation of the termination of the state of war with Japan on April 28, 1952, 66 Stat. c. 31, Proclamation No. 2974, which succeeded the joint resolution of Congress and the Presidential proclamation terminating the war with Germany on October 19, 1951, 65 Stat. 451, 66 Stat. c. 3. We do follow the Government insofar as we reject Sobell's contention that the "time of war" ended on September 2, 1945, or even earlier. Lee v. Madigan, supra, did not decide that; it held that June 10, 1949, was within a proviso of Article of War 92, 10

U.S.C. (1946 ed. Supp. IV) § 1564, prohibiting a military trial of a soldier for murder or rape committed within the United States "in time of peace." The Court said that terms such as war and peace "must be construed in light of the precise facts of each case and the impact of the particular statute involved." 358 U.S. at 230–231, 79 S.Ct. at 278. Nothing suggests it would have reached the same result if the conspiracy to commit murder there at issue had occurred in, say, late September, 1945. We have been cited to and have found nothing to indicate that any authority on international law, either in 1917, when § 32(a) was enacted, 40 Stat. 218, or since, would have considered a war to end, for governmental purposes,[7] as soon as the last shot was fired, even when the surrender was unconditional. See Ludecke v. Watkins, 335 U.S. 160, 166–170, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948). Although a leading treatise has long recognized that "Belligerents may * * * abstain from further acts of war and glide into peaceful relations without expressly making peace through a special treaty," 2 Oppenheim, International Law (2d ed. 1906), § 261, at p. 275, "glide" connotes a gradual rather than a sudden stop. A war may end also by subjugation of the enemy, but an unconditional surrender is not that when the successful belligerent has manifested no intention to hold the realm of the defeated one permanently under its dominion, id. §§ 264, 265, pp. 277–278; see also Phillipson, Termination of War and Treaties of Peace (1916), chs. I and II. A Congress containing many of the same members who had passed the Espionage Act of 1917 enacted a Joint Resolution terminating World War I on March 3, 1921, and declaring that "any Act of Congress, or any provision of any such Act, that by its terms is in force only during the existence of a state of war * * * shall be construed and administered as if such war * * * ter-

---

7. Decisions relating to the interpretation of insurance policies, leases, and other contracts are not very helpful; the considerations bearing on the intent of persons as to their private relations are usually quite different from those relating to the purpose of legislators as to governmental powers.

minated on the date when this resolution becomes effective \* \* \*." 41 Stat. 1359. On September 1, 1945, President Truman was assured by the Attorney General that the end of actual fighting had terminated no war legislation, 30 'Ops.Atty.Gen. 421, 422 (1945); a week later he asked the Congress to refrain from taking action that would end the war until a full study of the problem could be made. Message of September 8, 1945, 91 Cong.Rec. 8380. Congress complied with his request; not until 1947 did it enact a joint resolution repealing certain wartime statutes, 61 Stat. 449 (1947). We cite the 1945–1947 experience not as bearing directly on the intent of the Congress of 1917, but rather to illustrate how practicalities work against a construction that would strip government of "wartime" powers instantaneously and without opportunity even to consider how far they might be needed in a transitional period partaking of some elements of both war and peace. Cf. Woods v. Cloyd W. Miller Co., 333 U.S. 138, 141–143, 68 S.Ct. 421, 92 L.Ed. 596 (1948). The considerations that motivated the 1917 Congress to authorize the more severe penalties for espionage "in time of war" would not be dissipated the very moment when shooting stopped, even after unconditional surrender—with vast citizen armies, navies and air forces still in the field, allied military missions having access to American defense installations in the United States and abroad, and the danger of flare-ups in the defeated countries that might require military action for their suppression.

On the other hand, we cannot believe the Congress of 1917 would have thought the statute it was enacting would have the result that the death penalty for disclosing defense information to a foreign power "in time of war" should apply not only to disclosures during the less than four years of actual shooting between December 7, 1941 and August 14, 1945, but for six and a half years more, during which our wartime enemies had become our friends. In determining what a statute means when it speaks of war or peace, the purpose of the particular provision must be analyzed; such is the teaching of Lee v. Madigan. Here the purpose was to place the ultimate discouragement on communicating defense information when the nation was fighting for its own life, and to exact the ultimate penalty from those who did. Although this purpose would not end on the firing of the last shot or even on the signing of the surrender, it also would not continue indefinitely thereafter. The prospect of a prolonged interval after the end of the fighting, which bore all the indicia of peace with the former enemy save for a formal treaty, the signing of which was postponed by disagreement among the victorious allies, was not likely to have occurred to the Congress of 1917. That Congress lived in a tidier age, when wars had been generally followed by peace treaties signed with reasonable promptness after the end of fighting.[8] True, allies had been known to fall out over the division of the spoils, so

8. In the greatest previous war won by a coalition, peace with France was concluded by the first Treaty of Paris on May 30, 1814, seven weeks after Napoleon's abdication on April 11, 1814; the final settlement among the allies was reached at Vienna a year later, on June 9, 1815, despite the unseemly interruption of the Hundred Days; and a second Treaty of Paris was concluded on November 20, 1815. The Treaty ending the Crimean War, also waged by a victorious coalition, was signed on March 30, 1856, six and a half months after the fall of Sebastopol on September 11, 1855. In the case of our own country's war last preceding, World War I, hostilities with Spain were suspended August 12, 1898, 30 Stat. 1780, and ratifications of the peace treaty were exchanged April 11, 1899, 30 Stat. 1754. In World War I itself there was no great delay in the conclusion of a peace treaty or in its ratification by most of the powers; the Treaty of Versailles was signed on June 28, 1919, six and a half months after the armistice of November 11, 1918, and by the end of October, 1919, it had been ratified by all the principal belligerents save the United States.

that the friend of one day became the foe of the next and vice versa—the second Balkan War, following two months after the treaty ending the first, was a then recent example—but in such cases either the first "war" continued, or there was a brief "peace" followed by a new "war", with changed partners. Still the 1917 Congress must be taken to have been familiar with the notion that a "time of war" could end through simple cessation of hostilities even though no formal peace treaty had been concluded—in Oppenheim's phrase, that the former belligerents could "glide into peaceful relations." A half century earlier Secretary Seward had written:

> "It is certain * * * the situation of peace may be restored by the long suspension of hostilities without a treaty of peace being made. History is full of such occurrences. What period of suspension of war is necessary to justify the presumption of the restoration of peace has never yet been settled, and must in every case be determined with reference to collateral facts and circumstances." [9]

See also Phillipson, supra, ch. I.

We find it unnecessary to make such a determination here more precisely than to say that, for the purposes of § 32(a), the "war" had ended before the summer and fall of 1948, to which some of Elitcher's testimony against Sobell related.[10] True, American troops were still on foreign soil, but they were there for the same reasons that kept them there after April 28, 1952, when, as the Government concedes, the war with Germany and Japan had terminated. We add for clarity, as must be obvious, that nothing in the Constitution forbade Congress' making the heavier penalties applicable even to espionage carried on in peacetime, as it now has done, see fn. 1, supra, or taking other action, appropriate under the war power, that stretches into times of peace. The only question we have sought to answer is what the 1917 Congress meant by the phrase "in time of war".[11]

It follows that Sobell could properly have asked that the jury determine whether, if he had joined a conspiracy, he had done this in 1944–45 or only at some later date when, in our view, the United States was no longer at war for the purposes of § 32(a).[12] But nothing of the sort was suggested; everything said by Sobell's trial counsel assumed that the proviso applied to Sobell if the jury found him guilty as it unquestionably did to the Rosenbergs. Whether this was because counsel was not sensitive to the point, or because he thought it unlikely that the jury would draw a line through Elitcher's testimony and considered it a preferable trial tactic to emphasize the grave penalties a conviction

9. Dip.Cor.1868, II, 32, 34, Moore, Dig. VII, 366, cited in 2 Hyde, International Law (1922), pages 820–821, fn. 2.

10. In the light of the purpose of the proviso to § 32(a), a good date might be the President's proclamation of the end of hostilities on December 31, 1946, 61 Stat. 1048, even though the proclamation asserted that "a state of war still exists," as may well have been true for other purposes. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947); Woods v. Cloyd W. Miller Co., supra, 333 U.S. at 141–143, 68 S.Ct. at 422–423; Ludecke v. Watkins, supra, 335 U.S. at 166–170, 68 S.Ct. at 1432–1434; cf. Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 164–168, 40 S.Ct. 106, 64 L.Ed. 194 (1919).

11. Many World War I statutes contained definitions of their duration. See Hamilton v. Kentucky Distilleries & Warehouse Co., supra, 251 U.S. at 165–166 fn. 12, 40 S.Ct. at 111–112. The omission of any such provision from § 32(a) was presumably due to its having been intended as permanent legislation.

12. The use of special verdicts in a criminal case, to determine whether participation in a conspiracy continued past the effective date of increased statutory penalties, was considered and upheld in United States v. Gernie, 149 F.Supp. 272 (S.D. N.Y.1957), aff'd without discussion of the issue, 252 F.2d 664, (2 Cir.), cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958).

might entail, while being confident that Sobell's offense would not attract a death sentence, we do not know.

 Applying § 2255 as interpreted in our discussion of the Grunewald ground, Sobell again fails to make out a case for relief thereunder. The lack of any instruction to the jury to make a special finding relative to the penalty, which had not been requested, deprived Sobell of no constitutional right. It is true that the jury trial guaranteed in the Sixth Amendment, like that in the Seventh, is a trial not simply by a jury but by a jury acting under the instructions of a judge. United States v. Philadelphia & Reading R. R., 123 U.S. 113, 114, 8 S.Ct. 77, 31 L.Ed. 138 (1887). But the guarantee is also of instructions to the jury by a judge who is assisted by appropriate requests on the part of the defendant; that is one of the reasons why the Sixth Amendment assures him "the Assistance of Counsel for his defence." Rules 30 and 51 negate appellant's assumption that it is unnecessary for a defendant to make "known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." see Williams v. United States, 238 F.2d 215 (5 Cir., 1956), cert. denied 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596 (1957); Herzog v. United States, 235 F.2d 664 (9 Cir.), cert. denied 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1956). It is true that under F.R.Crim.Proc. 52 (b) an appellate court has power to notice "Plain errors or defects affecting substantial rights * * * although they were not brought to the attention of the court", but this provision does not transmute ordinary errors or defects into constitutional ones, or obliterate the distinction between direct appeal and collateral attack. Perhaps a case might arise where a charge tells a jury so little as to deprive a defendant, even though no request was made or objection taken, of rights guaranteed by the Sixth Amendment, and by the due process clause of the Fifth as well. But there is no denial of constitutional right because a judge

has not submitted as an issue what everyone plausibly assumed not to be one. See Kenion v. Gill, 81 U.S.App.D.C. 96, 155 F.2d 176 (1946); United States v. Jonikas, 197 F.2d 675 (7 Cir.), cert. denied 344 U.S. 877, 73 S.Ct. 171, 97 L.Ed. 679 (1952). Neither is this a case where there was no evidence that would warrant imposition of the higher penalty under the statute as we now construe it, a situation that might give rise to a due process claim of a different sort. See Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

 There is likewise no basis for concluding that although the failure under these circumstances to obtain from the jury a special finding of the date when Sobell joined the conspiracy was not of constitutional magnitude, he may nevertheless have relief under § 2255 because this seriously affected his trial and "exceptional circumstances" excuse his failure to raise the point either at trial or on appeal. We gravely doubt that the first branch of the argument is made out; it seems quite unlikely that the jury would have accepted only the part of Elitcher's testimony relating to later years. In any event the second is not. The contention is that until the 1959 decision in Lee v. Madigan, supra, it was settled law that "war" continued for all purposes until the ratification of a treaty of peace or official action by the President (or by Congress and the President) declaring its complete termination; hence, it is urged, appellant could not reasonably have been expected to raise the point before then, and thereby brings himself within what are asserted to be the implications of Sunal v. Large, supra, 332 U.S. at 181, 67 S.Ct. at 1592, see fn. 6 supra. It would seem a sufficient answer that neither the petitioner in Lee v. Madigan nor the six Justices who joined in that decision thought the law had been thus firmly settled. But there is more. We have already cited expressions, antedating Sobell's trial by many years, to the effect that "war" might terminate by a long cessation of hostilities. See also Note, Judicial Determination of the

End of the War, 47 Colum.L.Rev. 255, 256 and fns. 4 and 5 (1947). In the very year of Sobell's trial an eminent authority on international law, noting that no treaty of peace with Germany or Japan had yet been signed, wrote that "For some purposes, therefore, it may be said that the state of war with Germany and Japan continued; yet in view of the political developments, this view smacks of such unreality that no dogmatic statement can be made as to some of its possible consequences." Hudson, Cases on International Law (3d ed. 1951), page 618. The Supreme Court itself had indicated in 1948 that it might some day . be required to determine whether it could "find that a war though merely formally kept alive had in fact ended," although characterizing this as "a question too fraught with gravity even to be adequately formulated when not compelled." Ludecke v. Watkins, supra, 335 U.S. at 169, 68 S.Ct. at 1433. A new counsel for Sobell seems to have been aware of the point when he argued for a reduction of sentence in 1953, although Lee v. Madigan was still six years away. As with the Grunewald ground, the situation was that "at the time of the conviction the definitive ruling on the question of law had not crystallized," Sunal v. Large, 332 U.S. at 181, 67 S.Ct. at 1592—not that an alleged rule whereby only formal action could bring "war" to an end for any purpose had become so hardened that it would have seemed hopeless to question it.

The foregoing is largely determinative of Sobell's alternative motion for reduction of sentence under F.R.Crim. Proc. 35. The interpretation of that rule and its interrelation with the later-enacted § 2255, particularly the portions of that section speaking of a "sentence * * * in excess of the maximum authorized by law" and a sentence "not authorized by law or otherwise open to collateral attack", have recently concerned the Supreme Court. Heflin v. United States, 358 U.S. 415, 418, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L. Ed.2d 417 (1962). The Hill decision stated that "the narrow function of Rule 35 is to permit correction at any time of an illegal *sentence,* not to re-examine errors occurring at the trial or other proceedings prior to the imposition of sentence", 368 U.S. at 430, 82 S.Ct. at 472; Heflin said that "relief under Rule 35 of the Federal Rules of Criminal Procedure is available (at least where matters dehors the record are not involved)" when "the sentence imposed was illegal on its face", 358 U.S. at 418, 79 S.Ct. at 453.

■ The indictment charged, as we have said, that "On or about June 6, 1944, up to and including June 16, 1950 * * the United States of America then and there being at war", Sobell and others conspired *to violate* § 32(a), and the jury found him "guilty as charged." The indictment and the evidence were such that, on proper proceedings, sentence under the proviso might lawfully have been imposed. Sobell's complaints are that the indictment included too long a period in its definition of "war", and that, for want of an instruction never sought, we cannot tell whether the jury believed he had conspired during .or only after the "war". But the former complaint could have been the subject of a motion addressed to the indictment under Rule 12(b), and the latter was an appropriate subject for a request for an instruction under Rule 30. The sentence is thus not "illegal on its face"; the asserted defect consists of alleged "errors occurring at the trial or other proceedings prior to the imposition of sentence." These lie beyond the ambit of Rule 35. Cook v. United States, 171 F.2d 567, 570 (1 Cir., 1948), cert. denied 336 U.S. 926, 69 S.Ct. 647, 93 L.Ed. 1088 (1949); Stegall v. United States, 279 F.2d 872 (6 Cir.), cert. denied 364 U.S. 915, 81 S.Ct. 279, 5 L.Ed.2d 229 (1960). That Rule is confined to cases where the court can properly correct the sentence without any need for a new trial, yet the very nub of Sobell's argument is that the issue of the date of his entrance into the conspiracy was one on which a jury was required to but did not pass. It would

be quite improper for this Court, by utilizing Rule 35 to reduce Sobell's sentence, to place the Government in the same position as if the issue had been submitted to the jury and decided in his favor.

Affirmed.